# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY LYNN NORWOOD, CDCR #J-53407,<br><br>    Plaintiff,<br><br>vs.<br><br>JEANNE WOODFORD, et al.,<br><br>    Defendants. | Civil No.   07cv0057 WQH (JMA)<br><br>**ORDER GRANTING DEFENDANTS BOURLAND, GIURBINO, JANDA AND DOVEY'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c)**<br><br>**[Doc. No. 106]** |

## I.

### STATEMENT OF THE CASE

Gregory Norwood ("Plaintiff"), a state prisoner currently incarcerated at the California State Prison located in Corcoran, California, is proceeding pro se and *in forma pauperis* with a First Amended Complaint ("FAC") filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

Currently pending before the Court is Defendant Bourland, Dovey, Giurbino and Janda's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 106].

/ / /

/ / /

## II.

## PROCEDURAL BACKGROUND

Defendants Bourland, Dovey, Giurbino and Janda[1] move for summary judgment on the grounds that: (1) no genuine issues of material facts exist to show that they violated Plaintiff's Eighth Amendment rights; and (2) they are entitled to qualified immunity. On July 14, 2009, the Court advised Plaintiff of his rights and obligations to oppose Defendants' Motion pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc).[2] Plaintiff filed his Opposition on July 24, 2009 [Doc. No. 113]. The Court also granted Defendants' request to file a supplement to their Motion in light of the Ninth Circuit's recently published opinion in *Norwood v. Vance*, 572 F.3d 626 (9th Cir. 2009). *See* July 14, 2009 Order at 1. Because Defendants were permitted to supplement their Motion, the Court permitted Plaintiff to file a Supplemental Opposition [Doc. No. 117]. Defendants filed their Reply on August 13, 2009 [Doc. No. 113].

In addition, Plaintiff's First Amended Complaint is verified under penalty of perjury. *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (holding that a complaint or motion duly verified under penalty of perjury pursuant to 28 U.S.C. § 1746 may be used as an opposing affidavit under FED.R.CIV.P. 56.).

Having now exercised its discretion to consider the matter as submitted on the papers without oral argument pursuant to S.D. CAL. CIVLR 7.1.d.1, the Court hereby GRANTS

---

[1] Defendant Torres does not join in this motion as the Court's docket reflects that he has yet to be properly served.

[2] *Klingele* and *Rand* together require the district court "'as a bare minimum, [to provide a pro se prisoner] with fair notice of the requirements of the summary judgment rule.'" *Klingele*, 849 F.2d at 411 (quoting *Hudson v. Hardy*, 412 F.2d 1091, 1094 (D.C. Cir. 1968)). "It would not be realistic to impute to a prison inmate ... an instinctual awareness that the purpose of a motion for summary judgment is to head off a full-scale trial by conducting a trial in miniature, on affidavits, so that not submitting counter affidavits is the equivalent of not presenting any evidence at trial." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 n.4 (9th Cir. 1986) (internal quotation omitted). Actual knowledge or any level of legal sophistication does not obviate the need for judicial explanation. *Klingele*, 849 F.2d at 411-12. Thus, the district court is required to "tell the prisoner about his 'right to file counter-affidavits or other responsive materials and [to][ alert[] [him] to the fact that his failure to so respond might result in the entry of summary judgment against him.'" *Jacobsen*, 790 F.2d at 1365 n.8 (quoting *Klingele*, 849 F.2d at 411).

Defendants Bourland, Giurbino, Janda and Dovey's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c) for the reasons set forth in detail below.

### III.

### PLAINTIFF'S FACTUAL ALLEGATIONS

On August 18, 2005, Calipatria State Prison ("CAL") was placed on lockdown following an alleged assault involving Hispanic inmates and staff. (*See* FAC at 22.) On November 7, 2005, Plaintiff was transferred from California State Prison, Sacramento to CAL. (*Id.*) Upon Plaintiff's arrival, CAL remained on lockdown stemming from the August 18, 2005 incident. (*Id.*) Plaintiff alleges that as a result of the lockdown, he was confined to his cell for twenty-four hours a day, seven days a week, with the exception of brief shower periods. (*Id.* at 3.) Plaintiff alleges that his Eighth Amendment right to be free from cruel and unusual punishment was violated when Defendants Woodford, Janda, Bourland and Giurbino deprived him of outdoor exercise from November 7, 2005 to December 16, 2005, a period of 39 days. (*Id.*) The deprivation of outdoor exercise allegedly caused Plaintiff to suffer headaches, muscle cramps, stress, anxiety and depression. (*Id.*)[3]

On November 21, 2005, Plaintiff filed a CDC Form 602 grievance on behalf of a group of inmates to request access to outdoor exercise. (*Id.* at 21-23.) The grievance was denied by Defendant Janda, CAL Associate Warden during this time period. (*Id.* at 6.) Plaintiff filed a Second Level Appeal which was also denied by Defendant Bourland, CAL Chief Deputy Warden. (*Id.* at 24-25.) Plaintiff then appealed to the Director's Level which was also denied. (*Id.* at 26.) The denials indicate that no recreational activities were permitted for general population inmates due to the State of Emergency instituted on August 18, 2005. (*Id.* at 24, 26). The denials also indicate that the modified program and lockdown were initiated for reasons of security and safety, the continued suspension of yard privileges was necessary, and the decision

---

[3] Plaintiff also alleges a separate First Amendment cause of action against Defendant Torres. Defendants do not move for summary judgment on this ground as Defendant Torres has never been served in this action and the Deputy Attorney General for the remaining Defendants has informed the Court that they are not representing Defendant Torres. The Court has issued an Order to Show Cause why Defendant Torres and the claims made against him should not be dismissed for failing to prosecute. [Doc. No. 120]

regarding the reinstatement of yard privileges was being reviewed on a daily basis. (*Id.* at 24-26.)

## IV.

### DEFENDANTS' FACTUAL ALLEGATIONS

On August 18, 2005, several Hispanic inmates at CAL were involved in "multiple assaults or attempted murders of correctional staff which resulted in a lockdown." (Giurbino Decl. ¶ 2.) During the riot, several correctional officers were injured and staff used deadly force which resulted in an inmate death. (Builteman Decl. ¶ 4(a), Ex. A, Crime/Incident Report dated September 8, 2005.) Plaintiff was transferred to CAL on November 8, 2005 and thus, had no involvement in the prison riot that occurred on August 18, 2005. (*Id.* at ¶ 6.)

On August 19, 2005, Warden Giurbino requested that a State of Emergency be declared which was granted. (*See* Giurbino Decl. at ¶ 7.) As a result of the State of Emergency, a "lockdown" went into effect at CAL which included no outdoor exercise for inmates on Facilities A, B, and C. (*Id.*) Giurbino was responsible for "making decisions regarding programming at the prison." (*Id.* at ¶ 5.) His subordinates, Bourland and Janda, "did not have authority to deviate from the program status report and/or allow outdoor exercise for general population inmates, such as [Plaintiff], without [Giurbino's] authorization." (*Id.*)

In determining that a lockdown was needed, Giurbino considered "not only the August 18, 2005 attempted murders of staff, but also the degree of organization that went into the widespread assaults, the violence at Calipatria State Prison which had been ongoing and escalating over the past two years seemingly unabated by previous efforts." (*Id.* at ¶ 9.) In addition, Giurbino made such decisions to "bring about both immediate and long-lasting safety to prison inmates and staff." (*Id.*)

On September 16, 2005, Giurbino received permission to "conclude the declared State-of-Emergency" and Facilities A, B, C and D "would transition to modified program." (*Id.* at ¶ 13.) The modified program was reviewed on a weekly basis by Giurbino following evaluation of "intelligence gathered as a result of searches and inmate interviews, and other investigative activities." (*Id.* at ¶ 14.) As inmates were interviewed following the August 18th riot, all

inmates in Facility A, B, C and D were not permitted to have outdoor exercise as Giurbino "believed it would have been unsafe for staff to be exposed to unrestrained general population inmates until those inmates who were planning future assaults could be identified and removed from the general population." (*Id.* at ¶ 19.)

On November 8, 2005, Giurbino began lifting some restrictions for inmates that had passed a "risk assessment," including "easing restrictions on canteen, vendor packages and allowing visitation with limits." (*Id.* at ¶ 24.) In addition, inmates began to be allowed to attend medical appointments, were given access to the law library and "religious volunteers were allowed to walk the tiers." (*Id.*) On October 26, 2005, Giurbino was informed by intelligence from staff that "staff might be assaulted or killed once the institution resumed normal programming" and on November 1, 2005, a weapon was found in an inmate's cell. (*Id.* at ¶ 27.) On November 17, 2005, an Investigative Lieutenant informed Giurbino that "he had received information that safety and security might be affected by the African-American population." (*Id.*) Another battery on a peace officer occurred on December 8, 2005 and one day later another inmate manufactured weapon had been discovered. (*Id.* at ¶ 28.)

Permitting outdoor exercise to general population inmates during the lockdown period was not an option because of the large increase of inmates in Facilities A, B and C, an insufficient number of restraints, inadequate yard security and lack of "manpower needed for cell-feeding inmates, providing canteen items to cells, and escorting inmates in restraints to showers, medical appointments, dental appointments, mental health appointments, law library, visitation, and any other movement outside the." (*Id.* at ¶ 31.) In addition, there were "ongoing projects to improve the yards" for "at least a couple of months after the incident." (*Id.*) Finally, Giurbino declares "[a]llowing inmate Norwood, or a select group of general population inmates outdoor exercise was not an option because approximately 50 new inmates were admitted every week to the institution beginning August 19, 2005 making this process logistically impossible." (*Id.* at ¶33.) To permit "special treatment" for a select group of inmates would have the potential to place pressure on those inmates to engage in violence. (*Id.*)

# V.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court shall consider all admissible affidavits and supplemental documents submitted on a motion for summary judgment. *See Connick v. Teachers Ins. & Annuity Ass'n*, 784 F.2d 1018, 1020 (9th Cir. 1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). However, to avoid summary judgment, the nonmovant cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Rather, he must present "specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court may not weigh evidence or make credibility determinations on a motion for summary judgment. Quite the opposite, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id.* at 255; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The nonmovant's evidence need only be such that a "fair minded jury could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 255. However, in determining whether the nonmovant has met his burden, the Court must consider the evidentiary burden imposed upon him by the applicable substantive law. *Id.*

A verified complaint or motion may be used as an opposing affidavit under FED.R.CIV.P. 56 to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam) (complaint); *Johnson v. Meltzer*, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (motion). To "verify" a

complaint, the plaintiff must swear or affirm that the facts in the complaint are true "under the pains and penalties of perjury." *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995).

### B.    Defendant's Arguments

Defendants argue they are entitled to judgment as a matter of law pursuant to FED.R.CIV.P. 56 because:  1) no genuine issues of material fact exist to show that Defendants violated Plaintiff's Eighth Amendment rights; and (2)  Defendants are entitled to qualified immunity.

#### 1.    42 U.S.C. § 1983

Section 1983 authorizes a "suit in equity, or other proper proceeding for redress" against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution." *Nelson v. Campbell*, 541 U.S. 637, 124 S.Ct. 2117, 2122 (2004).  Here, there is no dispute that Defendants acted under color of state law when they ordered implementation of lockdown procedures at CAL which limited Plaintiff's access to outdoor exercise from November 8, 2005 to December 17, 2005.  Thus, the resolution of the Summary Judgment Motion turns on the second inquiry:  whether a genuine issue of material fact exists to show that Defendants' actions constituted cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights.

#### 2.    Eighth Amendment's Cruel and Unusual Punishments Clause

"Whatever rights one may lose at the prison gates, ... the full protections of the eighth amendment most certainly remain in force.  The whole point of the amendment is to protect persons convicted of crimes." *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979) (citation omitted).  The Eighth Amendment, however, is not a basis for broad prison reform.  It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable. *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).  Rather, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S.

1  153, 173, 183 (1976); *see also Farmer*, 511 U.S. at 834; *Rhodes*, 452 U.S. at 347. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Although prison administrators generally have broad discretion in determining whether to declare emergencies and impose "lockdowns" to control institutional disturbances, the conditions imposed during the lockdown may constitute cruel and unusual punishment under the Eighth Amendment. *See Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (denial of outdoor exercise may give rise to Eighth Amendment violation even in response to emergency conditions). To assert an Eighth Amendment claim for deprivation of humane conditions of confinement, a prisoner must satisfy two requirements: one objective and one subjective. *Farmer*, 511 U.S. at 834; *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994).

"Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. This objective component is satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit*, 682 F.2d at 1246; *Farmer*, 511 U.S. at 833; *Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir. 1981).

The subjective requirement, relating to the defendants' state of mind, requires "deliberate indifference." *Allen*, 48 F.3d at 1087. "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 835.

### a.   Objective Requirement

Plaintiff alleges that the complete deprivation of outdoor exercise from November 8, 2005 to December 16, 2005 resulting from Giurbino's decision to implement lockdown and modified lockdown restrictions constituted cruel and unusual punishment (*See* FAC at 3.) The Ninth Circuit has stated that "regular outdoor exercise is extremely important to the psychological and

1  physical well being of the inmates." *Spain*, 600 F.2d at 199 (holding that prisoners in long-term
2  and continuous segregation must be provided regular outdoor exercise unless "inclement
3  weather, unusual circumstances, or disciplinary needs" make it impossible).  However, as the
4  Ninth Circuit further recognized in *Hayward,* when a lockdown is instituted in response to a
5  genuine emergency, the decisions regarding when and how to provide for outdoor exercise "are
6  delicate ones, and those charged with them must be given reasonable leeway." *Hayward*, 629
7  F.2d at 603.

8       Here, the record is clear that the restrictions placed on Plaintiff's access to outdoor
9  exercise was in response to a riot that involved inmates assaulting correctional officers resulting
10 in serious injuries to these correctional officers. (Giurbino Decl. ¶ 7, 9.)  Giurbino implemented
11 a "state of emergency" the day following the riot. (*Id.*)  During the time frame in which Plaintiff
12 was denied outdoor exercise, prison officials were meeting on a nearly daily basis to assess
13 investigative intelligence and interviewing inmates to determine who was responsible for the
14 riot. (*Id.* at ¶¶ 14- 15.)  Giurbino implemented the modified programming that allowed for some
15 privileges to be returned to general population inmates such as allowing medical and dental visits
16 and easing restrictions on canteen, vendor packages and visitation. (*Id.* 24.)  During this time
17 frame while restrictions were being eased, prison officials discovered inmate manufactured
18 weapons, an escape plot, planned staff assaults by African American inmates and difficulties in
19 securing the exercise yard. (*Id.* at ¶¶ 27-28.)  Plaintiff was taken out of general population and
20 moved to Administrative Segregation which permitted outdoor exercise on December 17, 2005.
21 (*See* Johnson Decl. ¶ 6(a), Exhibit A, CDC Form 114-D "Administrative Segregation Unit
22 Placement Notice" dated December 10, 2005.)

23      "Although exercise is 'one of the basic human necessities protected by the Eighth
24 Amendment' ... a temporary denial of outdoor exercise with no medical effects is not a
25 substantial deprivation." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (twenty-two days
26 insufficient to establish Eighth Amendment violation) (*quoting LeMaire v. Maass*, 12 F.3d 1444,
27 1457 (9th Cir. 1993)).  Here, Plaintiff alleges that he was denied outdoor exercise of a period of
28 five weeks which could arguably support the objective component of an Eighth Amendment

1  claim. *See e.g., Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (en banc) (finding six and
2  one-half weeks deprivation of "all access to outdoor exercise" sufficient to satisfy Eighth
3  Amendment's objective requirements).

4        **b.**      **Subjective Requirement**

5  However, in order to avoid summary judgment, Plaintiff must show there are triable
6  issues as to the Eighth Amendment's subjective requirement. *Farmer*, 511 U.S. at 834. In this
7  regard, the Court finds no evidence in the record to support Plaintiff's claim that the denial of
8  outdoor exercise, which began as a result of a serious riot, was the result of Defendant's
9  "deliberate indifference." *Farmer*, 511 U.S. at 835; *Lopez*, 203 F.3d at 1133.

10  Plaintiff claims that the subjective requirement is "satisfied by plaintiff putting the
11  officials on notice in a 602 grievance (group appeal) during deprivation" and also by a "medical
12  complaint," as well as "existing caselaw that dictates outdoor exercise is a right." (*See* Pl.'s
13  Opp'n at 4.) However, as the Ninth Circuit recently informed Plaintiff in a published opinion,
14  previous case law regarding alleged deprivation of outdoor exercise does not hold that "a
15  prisoner's right to outdoor exercise is absolute or indefeasible, or that it trumps all other
16  considerations." *Norwood v. Vance*, 572 F.3d 626, 632 (9th Cir. 2009). Instead, "prison
17  officials have a duty to keep inmates safe, and in particular to protect them from each other"
18  while balancing "this imperative against other obligations that our laws impose, such as
19  providing outdoor exercise." *Id.*

20  The evidence before the Court shows that the suspension of outdoor exercise began after
21  a riot erupted on August 18, 2005 involving the attempted murder of prison staff. (Giurbino
22  Decl. ¶ 2.) One inmate was killed. (Builteman Decl. ¶ 4(a).) Plaintiff was not affected by the
23  lockdown until he was transferred to CAL on November 8, 2005. (*See* FAC at 3.) Defendants
24  have offered the Declaration of Giurbino who clearly sets forth a number of safety and security
25  concerns requiring the need for a lockdown as stated more fully above. In addition, in support

26
27
28

1  of their motion, Defendants offer the expert opinion of Robert G. Borg.[4] In Borg's opinion "the
2  high level of violence at Calipatria State Prison prior to, and on, August 18, 2005, called for a
3  drastic reestablishment of order, otherwise, the level of violence would likely have continued
4  to become more common and more severe." (Borg Decl., ¶ 5.)  He further states that
5  "[r]estoration of yard and meals in the dining room are the last activities that are typically
6  returned to normal programming in connection with a lockdown or modified program." (*Id.* at
7  ¶ 8.) Finally, Borg opines "[t]he decisions made regarding modified program at issue in this
8  lawsuit were required for the safety and security of the inmates and staff and the denial of
9  outdoor exercise was reasonable and served penological interests." (*Id.* ¶ 9.)

10  Plaintiff disputes these assertions and argues that Defendants "exaggerated their response
11  to the August 18, 2005 staff assaults." (Pl.'s Suppl. Opp'n at 3.)  Plaintiff also argues that the
12  documentation upon which Defendants relied in issuing the lockdown order is false and
13  misleading. (*See* Pl.'s Opp'n at 19.) For example, Plaintiff disputes that the attack by inmates
14  on the correctional officers was "attempted murder" as stated in the officer's reports. Plaintiff
15  argues that "attempted murders are planned" and are somehow distinguishable from "staff
16  assaults" which are "spontaneous." (*Id.*)  Plaintiff disputes the nature of the riot that occurred
17  on August 18, 2005 but provides only conclusory statements and no evidence to contradict
18  Defendant's safety concerns. Moreover, Plaintiff fails to provide any evidence to demonstrate
19  that "lockdowns were meant to be punitive or were otherwise implemented in bad faith."
20  *Norwood*, 572 F.3d at 631.

21  Thus, the record is replete with facts which reveal that restrictions on outdoor exercise
22  were instituted for the primary purpose of preventing further attacks, injuries and homicides.
23  There is simply no evidence before this Court which supports Plaintiff's claims that Defendants'

---

[4] Plaintiff appears to make an evidentiary objection to Borg's declaration stating, in part, that "this expert who is paid by the defendants and is a former prison employee is biased." (Pl.'s Opp'n dated July 24, 2003 at 35.) Moreover, Plaintiff objects to the relevancy of Borg's declaration as he disputes "the accuracy of the documents the expert reviewed." (*Id.*) However, when a party challenges the validity of an expert's testimony, "its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witness." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001). Plaintiff's conclusory objections are insufficient. Thus, Plaintiff's objection to the declaration of Robert Borg is OVERRULED.

1  actions were the product of any "deliberate indifference" on their part. *Farmer*, 511 U.S. at 837.
2  Thus, without more, this Court finds no genuine issues of material fact exist to show that
3  Defendants deprived Plaintiff of outdoor exercise with the "deliberate indifference" to his health
4  or safety necessary to support an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835.
5  Rather, the uncontroverted evidence establishes that the suspension of outdoor exercise was a
6  response to ongoing violence. Plaintiff has come forward with no evidence to support a finding
7  that the suspension or delay in restoration of outdoor exercise amounted to a violation of his
8  Eighth Amendment rights.

9  Accordingly, Defendants Bourland, Giurbino, Janda and Dovey are entitled to summary
10 judgment as a matter of law. *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 256; *Berg*, 794
11 F.2d at 459.

### 3. Qualified Immunity

13 Because the Court has found no violation of Plaintiff's Eighth Amendment rights, the
14 Court need not reach any issues regarding qualified immunity. *See County of Sacramento v.
15 Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the
16 defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the
17 deprivation of a constitutional right at all."); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001)
18 ("If no constitutional right would have been violated were the allegations established, there is
19 no necessity for further inquiries concerning qualified immunity.").

## VI.
### CONCLUSION AND ORDER

22 For all the reasons set forth in the Order the Court hereby: GRANTS Defendants Dovey,
23 Bourland, Giurbino and Janda's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56
24 [Doc. No. 106].
25 / / /
26 / / /
27 / / /
28

Because there are no remaining claims against Defendants Dovey, Bourland, Giurbino and Janda, and there is no just reason for delay, the Clerk of Court is directed to enter a final judgment as to Defendants Dovey, Bourland, Giurbino and Janda pursuant to FED.R.CIV.P. 54(b).

**IT IS SO ORDERED.**

DATED: October 7, 2009

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge